3:21-MJ-1079
FILED
MAY 21 2021
Clerk, U.S. District Court
Eastern District of Tennessee
At Knoxville

AFFIDAVIT IN SUPPORT OF
APPLICATIONS FOR SEARCH WARRANT AND CRIMINAL COMPLAINT

I, **FBI TFO Brandon Smith,** being first duly sworn, hereby depose and state as follows:

1. I have worked in the field of law enforcement for twenty-one years. I have been employed as a Deputy Sheriff/Detective with the Grainger County Sheriff's Office since 2007. I currently hold the rank of Lieutenant Detective. As a Deputy Sheriff/Detective I have been assigned to conduct narcotics investigations with the 4th Judicial District Drug and Violent Crimes Task Force since April 2015. I am also assigned to the Federal Bureau of Investigation Appalachia HIDTA Rocky Top Task Force. Prior to being employed by the GRAINGER County Sheriff's Department I was employed by the UNION County Sheriff's Office as a Deputy Sheriff, K9 Officer, and Detective from 1999 until 2007. During my employment as a Deputy Sheriff/Detective, Drug Task Force Agent and HIDTA Task Force Officer I have attended and completed various training schools and seminars dealing with drug investigative techniques. I have conducted or participated in hundreds of investigations involving the distribution of narcotics in East Tennessee, which have been prosecuted in state and federal court.

2. On at least one hundred occasions, I have acted in an undercover capacity to purchase narcotics from individuals trafficking in methamphetamine, prescription pills, marijuana, cocaine, and other Controlled Substances in violation of the Drug Control Act of the State of Tennessee. I have executed and participated in the execution of a number of search warrants resulting in the seizure of illegal narcotics, financial records, documents indicating the accumulation, concealment, and utilization of proceeds along with actual monetary, other tangible assets and proceeds of illegal drug activity. I have participated in wiretap investigations, conducted surveillance of drug transactions, seized evidence, arrested suspects, interviewed

suspects related to drug activity, interviewed confidential informants related to drug activity and conferred with prosecutors and other law enforcement officers in my community regarding narcotics investigations and, as a result, have gained considerable experience.

3. Through experience and training, I have also learned that individuals who deal in controlled substances and / or narcotics sometimes place assets derived from their criminal activities in names of other persons or corporate entities other than their own names. These dealers sometimes also use false names and identities in order to avoid detection of these assets by law enforcement agencies to avoid forfeiture of the same.

4. Individuals who deal in controlled substances and / or narcotics actually own and continue to use such assets derived from criminal activities and exercise dominion and control over this property, though it may be titled or recorded in the names of others.

5. Individuals who deal in controlled substances and / or narcotics who purchase larger amounts of controlled substance must maintain and have access to large amounts of cash in order to maintain and finance their ongoing narcotics business.

6. Individuals who deal in controlled substances often maintain some sort of records to keep up with their business activities, to include books, records, receipts, notes, ledgers, airline tickets, money orders, computer disk, tapes, papers, and/or other forms of information media, including smartphones, relating to the transportation, ordering, sale, and distribution of controlled substances.

7. Individuals who deal in controlled substances will very often hide contraband, proceeds of drug sales, large amounts of currency, financial records, precious metals, jewelry, and/or records of drug transactions in one or more of the following locations in order to conceal them from law enforcement officials:

- Secure locations such as their own residences;

- Residences or businesses of other co-conspirators;

- Their business;

- Banks or safety deposit boxes;

- Storage units.

8. When dealers in controlled substances amass large sums of money from the sale of drugs and other related criminal activities, they sometimes will attempt to legitimize these illegal profits so as to avoid suspicion from law enforcement officials, seizure and forfeiture of such wealth, and to further avoid federal tax liabilities. These dealers sometimes then "launder" their ill-gotten gains through various schemes, including use of the banking system, the purchase of cashier's checks, wire transfers of funds, bank money drafts, letters of credit, purchase of stocks, bonds and mutual funds, the purchase of automobiles, real estate investments, false reporting of the actual purchase prices of property, the structuring of financial transactions to avoid federal currency reporting requirements, the establishment of phony or "shell" corporations, and/or the establishment of business "fronts" which presents an easy method of claiming that ones wealth, actually gained from criminal enterprises, derived from a legitimate source.

9. Unexplained wealth is relevant and probative evidence of drug trafficking. Persons who deal in controlled substances commonly maintain addresses and telephone numbers in books, papers, electronic devices or other forms of information media, to include smartphones, which reflect names (or nicknames or aliases), addresses. and telephone numbers of their associates or customers in the drug trafficking organizations.

10. Individuals who deal in controlled substances sometimes possess photographs and/or videotapes of themselves, their criminal associates, their drugs, their weapons, and their property which are proceeds of illegal activities. They may also possess photographs and / or videotapes of themselves and their associates involved in activities that require the expenditure of large amounts of money that they have acquired through illegal activities.

11. Dealers in controlled substances commonly possess, actually or constructively, firearms, ammunition, and other types of weapons. These weapons are used to protect and secure their property, drugs and illegal profits from thieves in drug dealers are always at risk of being ripped off by other drug dealers and/or drug customers. Those rip-offs may occur during a drug transaction, during a home invasions robbery, or during a burglary. Also, because firearms are in demand by drug dealers, such items are often bartered for drugs. As such, firearms are considered tools of the drug trade.

12. Dealers in controlled substances commonly have in their possession cellular telephones, most commonly smartphones, that they use to communicate with others involved in the sale, purchase, and distribution of controlled substances. A number of these devices are designed to record or store numerical or alpha-numerical data and audible messages from individuals who may contact or attempt to contact the device. Further, these devices may record numbers which have been recently keyed, or which are most frequently keyed into the telephone. These devices also may contain stored photographs and/or videos related to drug trafficking. These types of information constitute evidence of their drug trafficking activities.

13. Dealers in controlled substances commonly "front" or loan drugs on consignment to some of their customers who must pay for their drugs from the proceeds of their resales. As a result, the drug dealers must keep records of transactions where they can have a quick and

reliable means to recall the status of such transactions. Very often, these records will be maintained at the residence or business used by the drug dealer or one of his / her accomplices.

14. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest warrants, and search warrants, and, therefore, does not attempt to set forth all of my knowledge about this matter.

15. I am have been involved in an investigation of **JELONN MARQUISE TATE, a.k.a "ROCKY" ("TATE"), EUGENE JAMES MITCHELL, III, a.k.a. "PUG" ("EUGENE MITCHELL"), DERRICK KELLEN MITCHELL ("DERRICK MITCHELL"), JOHN BELTON MITCHELL a.k.a. "JB" ("JOHN MITCHELL"), TAWANA DUNCAN CORTEZ ("CORTEZ"), RANDALL SCOTT SMITH a.k.a. "SCOTT SMITH" ("SMITH"), KEITH PIVONKA ("PIVONKA")**, and others, in connection with a large ice methamphetamine trafficking conspiracy that had been operating in and around Knoxville, Tennessee, in violation of 21 U.S.C. §§ 841 and 846. The Grand Jury has returned indictments on all of the forgoing coconspirators except PIVONKA. (*See* EDTN Case No. 3:20-CR-87, Docs. 36 and 57.) PIVONKA was not a named defendant in either indictment.

16. One or more coconspirators have identified PIVONKA as a meth distributor in the conspiracy.

17. On December 12, 2020, PIVONKA was traffic-stopped by officers with the Union County Sheriff's Office for a registration violation. The officer also had prior knowledge that PIVONKA had a revoked license. During the initial approach to the vehicle, the officer noticed a short rifle sitting beside PIVONKA's leg. For officer safety, the officer instructed
Page 5 of 10

PIVONKA and the passenger to exit the vehicle and asked if there were any other firearms in the vehicle. PIVONKA stated there was also a handgun in the console on the passenger side. While PIVONKA and the passenger were outside the vehicle, the officer did a record check on PIVONKA and confirmed that PIVONKA's license was revoked. During this check, the officer also discovered that PIVNOKA was a convicted felon out of Ohio. PIVONKA was arrested and the vehicle was searched. During the search of the vehicle, a clear plastic bag which contained a crystal-like substance believed to be methamphetamine was found in the back compartment of the front passenger seat. The officer also found a loaded .45 caliber handgun in the front seat of the vehicle. Multiple, loaded ammunition magazines also were located inside the car. The clear plastic bag containing the crystal-like substance was weighted and weighed approximately 22.9 grams.

18. PIVONKA was taken to the Union County Sheriff's Office, waived his *Miranda* rights in writing, and agreed to speak with law enforcement. During the interview, PIVONKA denied knowledge of the methamphetamine in the vehicle but explained that he worked as a bounty hunter and would purchase drugs to give to individuals to find the whereabouts of fugitives. PIVONKA also stated that he was not a convicted felon and that his Ohio convictions had been expunged.

19. One of the firearms was a FEG Model SA85M, 7.62x39 caliber semi-automatic; the other firearm was an American Tactical, Model Titan-LW, .45 caliber semi-automatic pistol.

20. ATF Special Agent Jason Dobbs, an interstate nexus expert, has opined that neither firearm was manufactured inside the State of Tennessee.

21. A records check indicates that PIVONKA is a convicted felon out of Ohio and his convictions have not been expunged. I have obtained certified copies of PIVONKA's felony

Page **6** of **10**
Case 3:21-mj-01079-DCP    Document 2    Filed 05/20/21    Page 6 of 10    PageID #: 8

judgments from Ohio. Additionally, I have learned that PIVONKA's probation or other form of supervision was transferred from Ohio to Tennessee, and that PIVONKA served the remaining term of his Ohio supervision in Tennessee. At this time, I do not know whether that supervision related to any of PIVONKA's felony convictions or some other misdemeanor conviction(s).

22. On May 20, 2021, TFO Brandon Smith met with U.S. Marshals to assist with the arrest of Amanda Johnson (Johnson) related to a sealed petition for violations of conditions of her supervised release. Law enforcement knew Johnson's address to be 3135 Highway 61 East, Luttrell, Tennessee 37779 (the "residence"), and knew that PIVONKA lived at this address as well. At approximately 10:00 a.m., law enforcement arrived at the residence, knocked on the door, and announced their presence. No one responded. A few minutes later, law enforcement heard a female voice start talking on the other side of the door but the individual refused to open the door. Law enforcement breached the front door and entered the residence. Once inside the residence, Johnson and PIVONKA was detained for officer safety while a safety sweep of the residence was conducted. During the safety sweep, law enforcement noticed several loaded ammunition magazines throughout the residence, as well as loose ammunition. Law enforcement also saw several firearm accessories and parts to include an AR15 (assault rifle) stock. Also in plain view were a pipe commonly used to smoke methamphetamine and a small amount of clear crystal substance believed to be methamphetamine. PIVONKA was barefoot during these interactions and was offered an opportunity to put on shoes or boots. PIVONKA indicated that he wanted shoes and directed law enforcement to his bedroom. Law enforcement saw a pair of cowboy boots and went to retrieve them. Then law enforcement noticed a visibly loaded revolver inside one of the boots.

23. PIVONKA waived his *Miranda* rights in writing and agreed to speak with law enforcement. PIVONKA stated that he was not a convicted felon and that his Ohio convictions had been expunged. PIVONKA stated that he had found the pipe and a bag of methamphetamine earlier that morning outside his residence while he was cleaning up. PIVONKA explained that he had planned to surrender the pipe and methamphetamine to law enforcement in the neighboring community of Blaine, Tennessee. PIVONKA stated that he did not sell methamphetamine but that he did use it.

24. I have discussed the quantities of ammunition observed at the residence on May 20, 2021, with ATF Special Agent Jason Dobbs, an interstate nexus expert, and SA Dobbs informed me that it is almost a certainty that at least some of the ammunition observed at the residence was manufactured outside the State of Tennessee.

25. Based on the foregoing, there is probable cause to believe that Keith PIVONKA committed the offense of being a previously convicted felon in possession of firearms and ammunition on December 12, 2020, and May 20, 2021, all in violation of Title 18, United States Code, Section 922(g)(1).

26. Also based on the foregoing, there is probable cause to believe that the search of the residence will lead to the discovery of contraband, objects, documents, and things that will constitute "evidence of a crime" and "property designed for use, intended for use, or used in committing a crime" within the meaning of Rule 41(c) of the *Federal Rules of Criminal Procedure*. Specifically, based on the foregoing, there is probable cause to believe that methamphetamine, firearms, ammunition, and incidia of PIVONKA's residency will be found at the residence.

27. The residence (3135 Highway 61 East, Luttrell, Tennessee 37779) is described as a two-level single-family residence with a garage underneath and the living quarters on top. It is the third residence on the East side of Highway 61 next door to "One Stop Auto" and a market/deli. A photograph of the residence is below, with a red "X" on it and a red arrow pointing to it.



Page **9** of **10**

28. To arrive at and access the residence (3135 Highway 61 East, Luttrell, Tennessee 37779) from the intersection of Rutledge Pike and Highway 61/TN-61 coming from Knoxville, Tennessee, turn East (left) onto Highway 61/TN-61 and travel approximately five miles and the residence is on your right, third back from the Highway.

Respectfully submitted,

*Brandon Smith TFO/FBI*
Brandon Smith
Task Force Agent
FBI Rocky Top HIDTA Task Force

Subscribed and sworn to before me on 20th May, 2021

*Debra C. Poplin*
HON. DEBRA C. POPLIN
UNITED STATES MAGISTRATE JUDGE